2000 UT 16

David and Barbara SWENSON,
Plaintiffs and Appellants,

v.

David V. ERICKSON, Defendant
and Appellee.

No. 980075.

Supreme Court of Utah.

Jan. 19, 2000.

Rehearing Denied March 29, 2000.

Budge W. Call, Salt Lake City, for plaintiffs.

J. Thomas Bowen, Midvale, for defendant.

HOWE, Chief Justice:

¶ 1 Plaintiffs David and Barbara Swenson appeal from the trial court's dissolution of their preliminary injunction against defendant David Erickson and the dismissal of their complaint against him. The court ruled that the woodworking shop that Erickson constructed did not violate the restrictive covenants governing the subdivision in which Erickson and the Swensons live, and that the Swensons' claims became moot after the representative of an architectural committee approved Erickson's structure.

## BACKGROUND

¶ 2 The Swensons and Erickson own adjoining lots in Quail Point Subdivision in Salt Lake County. Quail Point lots are subject to restrictive covenants recorded in July 1973. In July or August 1997, Erickson commenced the construction of a building on his lot that he intended to use as a woodworking shop and private storage facility. The structure is approximately 288 to 384 square feet and 12 feet high. Erickson did not obtain preapproval from the subdivision's architectural committee for this structure, as required by the restrictive covenants.[1] However, the committee had not functioned for the previous twenty-three years, if it ever functioned at all.

¶ 3 In July 1997, having notified Erickson that the structure would violate the restrictive covenants, and having given him written notice of their intent to legally oppose the building, the Swensons brought this action to enjoin Erickson's construction and to compel him to remove the building. Erickson, however, proceeded, completing much of the structure by mid-August.

¶ 4 In August 1997, the trial court issued a temporary restraining order and, in September, granted the Swensons a preliminary injunction precluding Erickson from further work on or in the structure. After the preliminary injunction issued, two of the original appointed members of the architectural committee, Mary Campbell and Charles R. Kirton, designated Robert Campbell as the sole representative of the committee. Campbell then formally approved Erickson's structure as to its external design, location, and finished ground elevation. Campbell also circulated a petition among Quail Point homeowners to terminate the restrictive covenants. Owners of thirty-eight of the fifty-two Quail Point lots signed the petition. Campbell then recorded a notice of termination of the restrictive covenants with the Salt Lake County recorder.

¶ 5 Erickson next moved pursuant to Utah Rule of Civil Procedure 12(b)(6), to dismiss the Swensons' complaint and dissolve the temporary restraining order, asserting that the termination of the covenants rendered the Swensons' complaint for breach of the covenants moot. The Swensons in turn moved to nullify the notice of termination. The trial court granted Erickson's motion and set aside the preliminary injunction after concluding that the covenants did not prohibit Erickson's workshop, and that Campbell's approval of the workshop subsequent to the preliminary injunction rendered the Swensons' claims moot.

Article I of the covenants provides in part:

No structure shall be erected, altered, placed or permitted to remain on any "residential lot" other than one detached single

---

1. Under article I of the covenants, no structure may be:
   erected, placed or altered on any premises in [Quail Point] until the building plans, specifications, and plot plans showing the location of such building have been approved as to con-

formity and harmony of external design with existing structures in the development, and as to location of the building with respect to topography and finished ground elevation by an architectural committee....

family dwelling, a private garage, a guest house, and outbuildings for pets as hereinafter described. . . .

With respect to setback requirements for outbuildings, article III requires:

No outbuilding shall be erected, altered, placed or permitted to remain nearer than eight (8) feet to either side line of a lot unless no portion of said building extends nearer to the street line than sixty-five (65) feet.

Finally, article VI prohibits the use of certain structures for human habitation on Quail Point lots:

No trailer, basement, tent, shack, garage, barn or other outbuilding erected on a building site covered by these covenants shall at any time be used for human habitation temporarily or permanently, nor shall any structure of a temporary character be used for human habitation.

¶ 6 By 1997, before Erickson built his structure, there had been erected on approximately nineteen of fifty-two Quail Point lots small storage-type sheds and other similar structures that did not qualify as single-family dwellings, private garages, guest houses, or outbuildings for pets.

¶ 7 The Swensons appeal, contending that (1) the restrictive covenants prohibit the erection of Erickson's workshop; (2) Robert Campbell, the representative of the architectural committee, did not have the authority to relieve Erickson of complying with the covenants; (3) if Campbell or the committee had that authority, Erickson did not obtain preapproval from him or the committee to erect the workshop as required by the covenants; and (4) the notice of termination is invalid and cannot immediately terminate the covenants.

## STANDARD OF REVIEW

■ ¶ 8 This case comes to this court following the trial court's grant of a rule 12(b)(6) motion to dismiss in favor of Erickson. However, in granting the 12(b)(6) motion, the trial court and the parties relied extensively on materials beyond the allegations of the complaint. Where outside matters are "presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Utah R. Civ. P. 12(b).

¶ 9 In their briefs and at oral arguments to this court, both parties again rely extensively on evidence from the preliminary hearing, affidavits, and supporting documents. Because from the outset the parties have submitted extraneous materials and treated the motion to dismiss as a motion for summary judgment, neither party was prejudiced or unfairly surprised by the trial court's implicit conversion of Erickson's 12(b)(6) motion into a motion for summary judgment. *See DOIT, Inc. v. Touche, Ross & Co.,* 926 P.2d 835, 838–39 n. 3 (Utah 1996) (citing *World Peace Movement of Am. v. Newspaper Agency Corp.,* 879 P.2d 253, 256 n. 2 (Utah 1994); *Warren v. Provo City Corp.,* 838 P.2d 1125, 1127 n. 2 (Utah 1992); *Johnson v. Morton Thiokol, Inc.,* 818 P.2d 997, 999 (Utah 1991)). Therefore, we treat the trial court's order as a summary judgment for Erickson.

■ ¶ 10 On review of a summary judgment motion, we consider the evidence in the light most favorable to the nonmoving party and affirm only where it appears that there is no genuine dispute as to any material issues of fact and the moving party is entitled to judgment as a matter of law. *See Thayne v. Beneficial Utah, Inc.,* 874 P.2d 120, 124 (Utah 1994) (citing *Themy v. Seagull Enters. Inc.,* 595 P.2d 526, 528–29 (Utah 1979)). We review the trial court's legal determinations for correctness. *See Geisdorf v. Doughty,* 972 P.2d 67, 69–70 (Utah 1998).

## ANALYSIS

### I. STRUCTURES PROHIBITED UNDER THE RESTRICTIVE COVENANTS

■ ¶ 11 We first address whether Quail Point's restrictive covenants prohibit the erection of Erickson's workshop. Restrictive covenants that run with the land and

encumber subdivision lots form a contract between subdivision property owners as a whole and individual lot owners; therefore, interpretation of the covenants is governed by the same rules of construction as those used to interpret contracts. *See South Shore Homes Ass'n v. Holland Holiday's,* 219 Kan. 744, 549 P.2d 1035, 1042 (1976); *Gosnay v. Big Sky Owners Ass'n,* 205 Mont. 221, 666 P.2d 1247, 1250 (1983); *Tompkins v. Buttrum Constr. Co. of Nev.,* 99 Nev. 142, 659 P.2d 865, 866 (1983); 9 Richard R. Powell, *Powell on Real Property* § 60.05, at 60–82 (Patrick J. Rohan ed., 1998); 20 Am.Jur.2d *Covenants* § 170, at 591 (1995). Generally, unambiguous restrictive covenants should be enforced as written. However, where restrictive covenants are susceptible to two or more reasonable interpretations, the intention of the parties is controlling. *See* Powell, *supra,* § 60.05, at 60–82. The intention of the parties is ascertained from the document itself and the language used within the document. *See Buehner Block Co. v. UWC Assoc.,* 752 P.2d 892, 895 (Utah 1988); Powell, *supra,* § 60.05, at 60–82.

■ ¶ 12 Article I of the covenants provides in relevant part, "No structure shall be altered, placed or permitted to remain on any 'residential lot' other than one detached single family dwelling, a private garage, a guest house, and outbuildings for pets as hereinafter described." The parties do not dispute that Erickson's workshop does not fit neatly within those four types of structures. The confusion surrounding what structures may be erected arises from language contained in other articles of the covenants. Specifically, article VI requires that "[n]o trailer, basement, tent, shack, garage, barn or other outbuilding erected on a building site covered by these covenants shall at any time be used for human habitation temporarily or permanently, nor shall any structure of a temporary character be used for human habitation." Article III addresses outbuildings further, requiring that "[n]o outbuilding shall be erected, altered, placed or permitted to remain nearer than eight (8) feet to either side line of a lot unless no portion of said building extends nearer to the street line than sixty-five (65) feet." On the basis of its reading of articles VI and III, and in an effort to give

effect to the covenants as a whole, the trial court held that, as a matter of law, the covenants do not prohibit the building of Erickson's workshop. The court reasoned that the term "outbuildings for pets" in article I "is not limited to those buildings that only house pets, but, rather, the term includes trailers, tents, shacks, garages, barns, and the like." The trial court's interpretation of the language of a restrictive covenant, absent resort to extrinsic evidence, presents a question of law which we review for correctness. *See, e.g., Buehner,* 752 P.2d at 895.

¶ 13 The Swensons contend that article I specifically limits what structures may be built in Quail Point. Article VI, although referring to other buildings, specifically prohibits human habitation and does not expand the types of structures permitted under article I. Therefore, the Swensons argue, specific limitations in article I prescribing the structures Quail Point owners may build should prevail over the general language of article VI prohibiting the use of certain structures for human habitation. Erickson contends that if only the four types of structures in article I are permitted, the terms used in article VI (i.e., trailer, tent, shack, barn, or other outbuilding) are rendered superfluous. He also argues that the use of the term "outbuilding" in article III and its concern that outbuildings not be located within eight feet of a lot's side line unless they are sixty-five feet from the street implicitly suggests that the drafters of the covenants intended to allow outbuildings other than for pets, such as sheds, barns, and workshops.

■ ¶ 14 A plain reading of articles I and VI reveals two distinct purposes. Article I's primary purpose is to limit the types of structures permitted on a residential lot in Quail Point. On this point, article I is clear and unambiguous; Quail Point homeowners may erect four permanent structures on their lots: (1) a single family dwelling; (2) a private garage; (3) a guest house; and (4) outbuildings for pets. Article VI's primary purpose is to prohibit human habitation of any structures other than a main dwelling or a guest house, as permitted by article I.

¶ 15 Close scrutiny of the language in article VI, however, diminishes the apparent inconsistency between article I and article VI. Use of the term "building site" instead of "residential lot" in article VI suggests that the drafters were concerned with preventing either builders or future homeowners from living in partially completed buildings (e.g., basements, garages, shacks, barns, or other outbuildings) or movable structures (e.g., trailers or tents) during prolonged construction on a residential lot or other unforeseen delay, or with preventing homeowners from changing the single-family residential character of the subdivision by having persons occupy buildings other than the main dwelling or guest house. The fact that article VI lists three permanent structures (i.e., shacks, barns, or other outbuildings) not otherwise allowed under article I is not determinative, as the overriding intent of article VI is to prevent human habitation of additional structures.

■ ¶ 16 It is also evident from the language of the covenants that Erickson's workshop does not fit neatly within the common and ordinary meaning of "trailer, basement, tent, shack, garage [or] barn" contained in article VI. Accordingly, even assuming that article VI expands the allowable structures under the covenants, the only term that could be read to allow the erection of Erickson's workshop is "other outbuildings." [2] It is not this court's practice to override specific language with general provisions dealing with wholly distinct subject matter. Under the well-established rule of construction *ejusdem generis*, general language must be confined to its meaning by specific enumeration which proceeds it, unless a contrary intention is shown. *See Parrish v. Richards*, 8 Utah 2d 419, 421–22, 336 P.2d 122, 123 (1959); Edwin Q. Patterson, *The Interpretation and Construction of Contracts*, 64 Colum. L.Rev. 833, 853 (1964). Here, no contrary intention is shown by any language of the covenants, and allowing the expansive reading put forth by Erickson would render the clear and explicit limitation in article I meaningless. The effect of Erickson's position would be to expand the four explicit allowable structures in article I to an infinite number of structures that could be said to qualify as "other outbuildings" under article VI. The drafters could not have intended such a result.

¶ 17 Finally, Erickson argues that because article III requires that no outbuilding be erected nearer than eight feet to either side line of a lot unless no portion of the building is within sixty-five feet of the street line suggests that Erickson's workshop is permissible under the covenants. According to Erickson, "[I]t is ludicrous to believe that the drafters of the covenants were concerned that a dog house might be located nearer to the street than 65 feet."

¶ 18 Erickson's interpretation of article III is untenable. First, article III does not contradict the explicit limitations in article I on those structures that Quail Point lot owners may build. Article I allows a single family dwelling, a guest house, a private garage, and outbuildings for pets, and in no way contradicts article III's requirement that these outbuildings be erected no closer than eight feet from either side line of a lot unless they are sixty-five feet from the street line. Second, article III does not prohibit the location of outbuildings within sixty-five feet of the street line, as Erickson suggests. An outbuilding must be at least sixty-five feet from the street line only if it is within eight feet of the side line of the lot.

■ ¶ 19 Finally, it is not for this court to second-guess the judgment of covenanting parties by including setback requirements for particular structures. It is this court's duty to enforce the intentions of the parties as expressed in the plain language of the covenants. *See Freeman v. Gee*, 18 Utah 2d 339, 345, 423 P.2d 155, 159 (1967). The most reasonable interpretation of the Quail Point covenants is that they expressly prohibit the erection of Erickson's building because it is not a single family dwelling, a guest house, a private garage, or an outbuilding for pets.

## II. ABANDONMENT OF RESTRICTIVE COVENANTS

¶ 20 Erickson contends that even if article I prohibits his structure, that covenant has

---

2. Generally, an outbuilding is something which is to be used in connection with a main building or which is subservient to it, although distinct therefrom. 20 Am.Jur.2d *Covenants* § 181.

been abandoned by Quail Point owners. We therefore address whether Quail Point lot owners have abandoned the restrictions, as evidenced by their construction of numerous other structures, mainly small storage-type sheds and other similar structures, since recording the covenants in 1973.

■ ¶ 21 Restrictive covenants are a common method of effectuating private residential developmental schemes. *See* Powell, *supra,* § 60.06[3], at 60–104 to 60–112. Property owners who purchase land in such developments have a right to enforce such covenants against other owners who violate them. *See Crimmins v. Simonds,* 636 P.2d 478, 480–81 (Utah 1981); Powell, *supra,* § 60.07[c], at 60–121. Conduct by property owners within a development, however, may terminate and render unenforceable a particular covenant where such conduct so substantially changes the character of the neighborhood as to neutralize the benefit of the covenant, *see Crimmins,* 636 P.2d at 479, or constitutes evidence of the abandonment of the covenant. *See Fink v. Miller,* 896 P.2d 649, 653 (Utah Ct.App.1995).

■ ¶ 22 The case law is uniform that before an abandonment of a covenant may be found there must be "substantial and general noncompliance" with the covenant. *B.B.P. Corp. v. Carroll,* 760 P.2d 519, 524 (Alaska 1988); *Tompkins,* 659 P.2d at 867. One court has stated that in order for there to be an abandonment, a covenant must be "habitually and substantially violated." *Reading v. Keller,* 67 Wash.2d 86, 406 P.2d 634, 637 (1965) (internal quotations omitted). The violations must be so substantial as to destroy the usefulness of the covenant and support a finding that the covenant has become burdensome. *See Keller v. Branton,* 667 P.2d 650, 654 (Wyo.1983). If the original purpose of the covenant can still be accomplished and substantial benefit will continue to inure to residents, the covenant will stand. *See Tompkins,* 659 P.2d at 867. This court in *Papanikolas Brothers Enterprises v. Sugarhouse Shopping Center Associates,* 535 P.2d 1256 (Utah 1975), in determining whether a covenant should no longer be enforceable because of changed conditions, stated:

Before a change will vitiate a covenant, it must be of such a magnitude as to neutralize the benefits of the restriction, to the point of defeating the object and purpose of the restrictive covenant. The change required to afford relief is reached, where the circumstances render the covenant of little or no value. Here, the purpose of the restriction is yet a valid one, and the contemplated benefits to the plaintiff still exist. The purpose of the covenant has neither ceased nor become useless.

*Id.* at 1261 (citing *Metropolitan Inv. Co. v. Sine,* 14 Utah 2d 36, 41, 376 P.2d 940, 943 (1962)). Evidence of abandonment must be established by clear and convincing evidence. *See Metropolitan,* 14 Utah 2d at 41, 376 P.2d at 943.

■ ¶ 23 Courts are uniform that no abandonment of a covenant will be found where violations are of a "minor nature" and do not destroy the general building scheme, *see Reading,* 406 P.2d at 636; if the violations are "slight, unimportant, and unsubstantial," *Guyton v. Yancey,* 240 La. 794, 125 So.2d 365, 371 (1960); or if the violations are "inoffensive." *See Keller,* 667 P.2d at 654.

¶ 24 Typical of the cases where an abandonment of a covenant has been found is *B.B.P.,* 760 P.2d 519. There, a covenant required all lot owners to cut and destroy all poplar, cottonwood, and aspen trees on their lots to make room for the more desirable spruce and birch. *See id.* at 520. However, lot owners learned through experience that strict compliance was impossible because poplar, cottonwood, and aspen trees are extremely hardy, and they sprout from roots and reseed themselves. Even bulldozing all of those trees would not bring a lot into compliance because they would soon spring back, and bulldozing would cause excessive erosion. *See id.* at 521. As a result, none of the lots were in full compliance with the covenant, and only eighteen of the approximately eighty-eight residents had taken substantial steps toward compliance. *See id.* The court held that the covenant had been abandoned because the evidence revealed substantial and general noncompliance. The court noted that in order to fully comply, each resident would be required to cut and

thin trees each year, far exceeding the cutting that was apparently contemplated by the covenant originally. Thus, the residents would be subject to a far heavier burden than they originally bargained for. Full compliance was found to be impossible to achieve and even substantial compliance would be extremely burdensome. *See id.* at 524.

¶ 25 In contrast to that case where an abandonment of a covenant was found, the Wyoming Supreme Court in *Keller,* 667 P.2d 650, found no abandonment of a covenant which prohibited front yard fencing. Twenty lots out of approximately 120 to 130 lots had some kind of front yard fence. They were decorative fences, and the court held that they were not fences in the ordinary sense of indicating boundaries or holding something in or out. *See id.* at 654. The court emphasized that in order to find an abandonment of a protective covenant, the breaches acquiesced in must be so great or so fundamental or radical as to neutralize the benefit of the restriction to the point of defeating the purpose of the covenant. "In other words, the violations must be so substantial as to support a finding that the usefulness of the covenant has been destroyed, or that the covenant has become valueless to the property owners." *Id.*

¶ 26 Courts have also found that the erection of churches in a subdivision restricted to residential purposes technically violated the covenant, but the violation was too slight and inconsequential to effect material change, character, and use of the restricted territory. *See, e.g., Mechling v. Dawson,* 234 Ky. 318, 28 S.W.2d 18, 19 (1930). Similarly, in *Cowling v. Colligan,* 158 Tex. 458, 312 S.W.2d 943 (1958), the Supreme Court of Texas held that even though the subdivision had allowed several churches to be built there in violation of a covenant restricting the use of the lots for residential purposes the violation was so trivial in character that it did not operate as a waiver of the right of lot owners to enforce the covenant against business or commercial development, and it did not indicate an abandonment of the covenant. *See id.* at 946.

¶ 27 Thus, we adopt the test articulated by the court of appeals in *Fink,* 896 P.2d 649 for determining whether the owners

in Quail Point Subdivision have abandoned the restrictive covenants. We must examine: (1) the "number, nature and severity of the then existing violations"; (2) "any prior act of enforcement of the restriction"; and (3) "whether it is still possible to realize to a substantial degree the benefits intended through the covenant." *Id.* at 653–54.

¶ 28 In the instant case, nineteen of fifty-two Quail Point lots had garden and storage sheds that did not comply with the four building types allowed under article I. While the building of small storage sheds may technically violate article I, the violation is unsubstantial. The evidence indicates that the storage sheds have an average size of eight by ten feet and are approximately seven and a half feet in height, having an average of ninety-one square feet. These small sheds typically fit unobtrusively in a back corner of the lot, not on a foundation, and are used to store garden and yard tools. They are not occupied by lot owners and could be not much larger than an outbuilding for pets, which is expressly allowed under the covenant.

¶ 29 On the other hand, the woodshop built by defendant Erickson stands twelve feet high and is substantially larger than a storage shed. The building contains at least 288 square feet and may be as large as 384 square feet. It has a foundation and is occupied by Erickson for woodworking. Erickson testified that he intends to move his bandsaw into the workshop and buy other power tools. The Swensons' and Erickson's lots adjoin at the rear. The Swensons are directly impacted by the large structure built by Erickson.

¶ 30 There is a substantial difference between a small, unobtrusive, unoccupied and readily movable storage shed in the corner of a lot and a substantially larger and taller woodworking shop. The technical violation of the covenant here, the small storage sheds, can in no wise be deemed an abandonment. The original purpose of the covenant can still be accomplished, and substantial benefit can continue to inure to residents of the subdivision. The slight violation by lot owners in erecting small, unoccupied storage

sheds does not render the covenant useless. *See Papanikolas Bros.*, 535 P.2d at 1261. There is no other occupied structure in the subdivision comparable to the large shop built by Erickson in which to conduct woodworking. We thus conclude that there has been no abandonment of the restrictive covenants by the lot owners.

### III. APPROVAL OF PLANS

¶ 31 In article I of the covenants, provision is made for the appointment and duties of an architectural committee:

> No building shall be erected, placed, or altered on any premises in said development until the building plans, specifications, and plot plans showing the location of such building have been approved as to conformity and harmony of external design with existing structures in the development, and as to location of the building with respect to topography and finished ground elevation by an architectural committee composed of CHARLES R. KIRTON and other members selected by him or by a representative designated by the members of said committee.

After the district court granted a temporary restraining order and a preliminary injunction against Erickson, and after he had erected his workshop, he sought to comply with this covenant. Mary Campbell and Charles R. Kirton, the two surviving members of the original architectural committee, designated Robert Campbell as the committee's representative. Robert Campbell then formally approved Erickson's shed. However, this approval avails Erickson nothing, for two reasons.

¶ 32 First, the covenant requires that the architectural committee or its designated representative approve the building plan prior to the erection of any building on the lots. That was not done here. Approval came after the workshop had been erected. Secondly and more seriously, the restrictive covenant does not purport to give the architectural committee authority to relieve any lot owner of a duty to comply. There is no language in the covenant that could be construed to give such sweeping authority to the committee. Instead, the covenant grants to the committee the authority to examine building plans, specifications, and plot plans in order to determine "conformity and harmony of external design with existing structures" and location of the proposed building with respect to topography and finished ground elevation. The architectural committee can perform those duties without violating the covenants with regard to the four types of buildings allowed.

### IV. TERMINATION OF THE COVENANTS

¶ 33 Erickson contends that even if the committee's approval of his structure is invalid, the lot owners effectively terminated the covenants. Erickson circulated a petition that thirty-eight of the fifty-two homeowners signed, giving their approval of the termination of the covenants. Article XIV of the covenants provides:

> These covenants are to run with the land and shall be binding on all parties claiming under them until January 1, 1994, at which time said covenants shall be automatically extended for successive periods of 10 years unless by vote of a majority of the then owners of the building sites covered by these covenants it is agreed to change said covenants in whole or part.

¶ 34 Erickson argues that the petition constitutes the owners' majority vote to terminate the covenants. However, looking at the plain language of the article, the covenants are to be "automatically extended ... *unless by vote of a majority of the then owners.*" (Emphasis added.) Therefore, the owners have the power to amend the covenants, but only at such time as the covenants are due for extension. The last such time was January 1, 1994; we assume that the next such time will be on January 1, 2004. This being so, the petition, assuming it represents a majority vote of the owners, is still invalid. The owners' attempted termination of the restrictive covenants is without effect.

### V. ATTORNEY FEES

¶ 35 There is no provision in the covenants for an award of attorney fees to any owner who successfully seeks enforcement of the

covenants. The Swensons contend, however, that they are entitled to attorney fees under our wrongful lien statute, Utah Code Ann. § 38–9–7 (1997). They assert that the notice of termination of the restrictive covenants recorded by Robert Campbell in the office of the recorder of Salt Lake County constitutes a wrongful lien within the meaning of our statute. We disagree. Under section 38–9–1(6), a wrongful lien is defined as "any document that purports to create a lien or encumbrance on an owner's interest in real property." The notice of termination did not purport to place a lien or encumbrance on the Swensons' property. Their claim for attorney fees is without merit.

### CONCLUSION

¶ 36 The order of the trial court dissolving the preliminary injunction against Erickson and dismissing plaintiffs' complaint against him is reversed. The case is remanded to the trial court to enter a permanent injunction against Erickson and for any further proceedings in accordance with this opinion.

¶ 37 Associate Chief Justice DURHAM, Justice ZIMMERMAN, and Justice RUSSON concur in Chief Justice HOWE's opinion.

¶ 38 Justice STEWART concurs in the result.