2006 UT App 34

**David SWENSON and Barbara Swenson, Plaintiffs and Appellants,**

v.

**David V. ERICKSON and David R. Limberg, Defendants and Appellees.**

No. 20041041–CA.

Court of Appeals of Utah.

Feb. 2, 2006.

See also 998 P.2d 807.

Budge W. Call, Bond & Call, LC, Salt Lake City, for Appellants.

J. Thomas Bowen, Midvale, for Appellees.

Before Judges GREENWOOD, BILLINGS, and McHUGH.

## OPINION

McHUGH, Judge:

¶1 David and Barbara Swenson appeal the trial court's dismissal with prejudice of their complaint against David V. Erickson and David R. Limberg (collectively, Defendants). We affirm.

## BACKGROUND

¶2 The Swensons, Erickson, and Limberg are owners of abutting lots in the Quail Point Subdivision (the Subdivision) in Sandy, Utah. A real estate development company created the Quail Point Subdivision in July 1973, at which time that company recorded the Quail Point Subdivision Restrictive Covenants (the Covenants).

¶3 In 1997, Erickson began building a structure he intended to use as a workshop and storage facility on his lot in the Subdivision. The Swensons filed suit against Erick-

son, alleging that Erickson's structure violated the Covenants. As a result, the Swensons obtained an injunction prohibiting Erickson from building his structure. After the injunction issued, a majority of the Subdivision lot owners voted to terminate the Covenants, and a notice of termination of the Covenants was filed with the Salt Lake County Recorder. Erickson then filed a motion to dismiss the Swensons' complaint against him and to remove the injunction prohibiting him from building his structure. · In response, the Swensons filed a motion to nullify the notice of termination of the Covenants. The trial court granted Erickson's motion, dismissing the Swensons' complaint and setting aside the injunction. The Swensons appealed. In *Swenson v. Erickson*, 2000 UT 16, 998 P.2d 807 (*Swenson I* ), the Utah Supreme Court held that the Covenants prohibited Erickson's structure. *See id.* at ¶ 19. The *Swenson I* court also held that the Subdivision lot owners' attempted termination of the Covenants was invalid because it was undertaken prior to the expiration of the ten-year period specified by the plain language of the Covenants. *See id.* at ¶¶ 33–34. The *Swenson I* court remanded the case, *see id.* at ¶ 36, and thereafter, the trial court issued a permanent injunction that prohibited Erickson from keeping the structure on his lot.

¶ 4 On January 1, 2004, at the end of the ten-year period specified in the Covenants, another vote was conducted from 12:00 p.m. to 2:00 p.m., and a majority of the Subdivision lot owners voted to terminate the Covenants. On March 26, 2004, a notice of termination of the Covenants was filed with the Salt Lake County Recorder. The Swensons filed suit against Defendants seeking an order declaring that the March 26, 2004 notice of termination was void and requiring it to be removed, an order declaring that the Covenants were still valid and in effect, an order declaring that the permanent injunction previously issued by the trial court was still valid and in effect, an injunction prohibiting Defendants from erecting any structures on any Subdivision lots in violation of the Covenants, and costs and attorney fees. Thereafter, the Swensons filed a motion to nullify the March 26, 2004 notice of termination. The

court heard oral argument on the motion and took the matter under advisement.

¶ 5 In its October 25, 2004 written decision denying the Swensons' motion, the trial court ruled that the portion of the Covenants that allowed for changes to be made to them "in whole or part" included the power to terminate the Covenants. The trial court also concluded, based upon language contained in *Swenson I*, *see id.* at ¶ 34, that the vote conducted on January 1, 2004, was effective to terminate the Covenants. After issuing its decision, the trial court dismissed the Swensons' complaint against Defendants with prejudice. The Swensons appeal.

## ISSUES AND STANDARDS OF REVIEW

¶ 6 The Swensons argue that Defendants' termination of the Covenants was invalid because the Covenants do not allow for termination, but instead allow only for changes to be made to them "in whole or part." Alternatively, the Swensons argue that even if the terms of the Covenants allow for termination, the Defendants' termination was neither completed prior to the automatic renewal of the Covenants for a ten-year period, nor in accordance with the Utah Supreme Court's holding in *Swenson I*. *See id.* "The trial court's interpretation of the language of a restrictive covenant, absent resort to extrinsic evidence, presents a question of law which we review for correctness." *Id.* at ¶ 12. Further, "[w]hether a trial court correctly interpreted a prior judicial opinion is a question of law that we review for correctness." *Jensen v. IHC Hosps., Inc.*, 2003 UT 51, ¶ 56, 82 P.3d 1076.

## ANALYSIS

¶ 7 In relevant part, the Covenants provide:

These covenants are to run with the land and shall be binding on all parties and all persons claiming under them until January 1, 1994, at which time said covenants shall be automatically extended for successive periods of 10 years unless by vote of a majority of the then owners of the building sites covered by these covenants it is

agreed to change said covenants in whole or part.

■ ¶ 8 Based upon this language, the Swensons argue that the termination of the Covenants was invalid because the Covenants do not allow for termination, but instead allow only for changes to be made to them "in whole or part." We disagree. Instead, we agree with the trial court that the portion of the Covenants allowing for changes to them "in whole" includes the power to terminate or extinguish them. *See, e.g., French v. Diamond Hill–Jarvis Civic League,* 724 S.W.2d 921, 924 (Tex.App.1987) (addressing "the appellees' contention that there [was] no right to abolish the restrictions as opposed to merely amending them," stating that "[i]t has been held that the right to amend [restrictive covenants] includes the right to change them so as to remove [them]," and holding that "the majority of the owners had the right to amend the restrictions even to the point of destroying or removing them"); *see also Dansie v. Hi–Country Estates Homeowners Ass'n,* 1999 UT 62,¶ 14, 987 P.2d 30 ("Restrictive covenants are not favored in the law and are strictly construed in favor of the free and unrestricted use of property." (quotations and citations omitted)).

¶ 9 As an alternative argument, the Swensons contend that even if the Covenants allow for termination, the termination was not completed until after the Covenants had already been extended for a ten-year period, which the Swensons assert commenced at 12:01 a.m. on January 1, 2004. In contrast, Defendants argue that on January 1, 2004, the majority of the then owners of the Subdivision lots voted to release the Covenants and that this vote was effective to terminate them.

■ ¶ 10 Restrictive covenants are contracts that should be enforced consistently with the intention of the parties.

Restrictive covenants that run with the land and encumber subdivision lots form a contract between subdivision property owners as a whole and individual lot owners; therefore, interpretation of the covenants is governed by the same rules of construction as those used to interpret contracts. Generally, unambiguous restrictive covenants should be enforced as written. However, where restrictive covenants are susceptible to two or more reasonable interpretations, the intention of the parties is controlling. The intention of the parties is ascertained from the document itself and the language used within the document.

*Swenson I,* 2000 UT 16,¶ 11, 998 P.2d 807 (citations omitted).

■ ¶ 11 Thus, as with the interpretation of contracts generally, we "first look[ ] to the contract's four corners to determine the parties' intentions, which are controlling." *Fairbourn Commercial, Inc. v. American Hous. Partners, Inc.,* 2004 UT 54,¶ 10, 94 P.3d 292 (quotations and citations omitted). If that language is unambiguous, we will determine "the parties' intentions from the plain meaning of the contractual language as a matter of law." *Id.* (quotations and citations omitted); *see also Cooley v. Call,* 61 Utah 203, 211 P. 977, 980–81 (1922) ("[O]ur decision of this case is based entirely upon what we conceive to be the obvious intention of the parties at the time they executed the contract. We have endeavored to determine that intention from the plain, unambiguous terms of the contract considered in the light of what the parties must have foreseen and contemplated at the time the contract was executed.... [W]e deem it our duty to give effect to that intention without regard to technical rules, the too rigid application of which oftentimes defeats the very purpose for which they were intended."); *Cummings v. Nielson,* 42 Utah 157, 129 P. 619, 621–22 (1912) (stating that courts must give "the language found in [an] agreement its ordinary and usual meaning when applied to the subject-matter and nature of the agreement and apparent object or purpose of the parties" and that "[c]ourts will always incline towards giving language a reasonable construction, and will avoid, if possible, an absurdity if the language is susceptible of some other meaning"); *Daly v. Old,* 35 Utah 74, 99 P. 460, 463 (1909) ("The only thing ... that the courts are concerned with is to ascertain the intention of the parties to any contract, and, when this is ascertained, the duty to enforce such intention admits of no escape. A primary canon of construction is to con-

strue the language of the parties when applied to the subject-matter of the contract. The language used when applied to the subject-matter must be given its usual and ordinary meaning, unless it is clear that certain words or terms are employed in a technical sense.").

¶ 12 In *Swenson I*, the Utah Supreme Court interpreted the same language at issue here, stating:

Erickson argues that the petition constitutes the owners' majority vote to terminate the [C]ovenants. However, looking at the plain language of the article, the [C]ovenants are to be "automatically extended ... *unless by vote of a majority of the then owners.*" (Emphasis added.) Therefore, the owners have the power to amend the [C]ovenants, but only at such time as the [C]ovenants are due for extension. The last such time was January 1, 1994; we assume that the next such time will be on January 1, 2004.

*Swenson I*, 2000 UT 16 at ¶ 34, 998 P.2d 807 (third alteration in original) (quoting the Covenants).

¶ 13 Although the Swensons maintain that the Covenants were automatically extended at 12:01 a.m. on January 1, 2004, neither the Covenants nor the Utah Supreme Court's decision in *Swenson I* supports such a conclusion. The Covenants state that they will be automatically extended every ten years unless a majority of the then owners of the Subdivision lots votes to amend them in whole or in part. The Utah Supreme Court held that the intent of the parties was that changes to the Covenants could only be made at the conclusion of those ten-year periods, noting that the next opportunity to do so would be January 1, 2004. *See id.*

¶ 14 There is nothing in the document indicating that the parties to the original contract intended to have the 12:01 a.m. deadline suggested by the Swensons, and the Utah Supreme Court did not so hold. Rather, the express language supports an intent for the Covenants to run "until January 1, [2004], at which time" the automatic extension of them could be defeated by a majority vote of the then owners of the Subdivision lots. The inclusion of only a date without a specific time suggests that the vote could be

taken any time that day. If the parties had intended to impose a strict 12:01 a.m. deadline, as suggested by the Swensons, the Covenants could have said so. *See Dansie v. Hi-Country Estates Homeowners Ass'n*, 1999 UT 62, ¶ 14, 987 P.2d 30.

¶ 15 The record indicates that the vote in this case took place sometime between 12:00 p.m. and 2:00 p.m. on January 1, 2004. Because the vote took place on the date identified by the terms of the Covenants, we conclude that it was effective to change, even to the point of terminating, the Covenants.

CONCLUSION

¶ 16 We conclude that the portion of the Covenants allowing for changes to be made to them "in whole" includes the power to terminate or extinguish them. We also conclude that the vote that took place on January 1, 2004, was conducted in accordance with the terms of the Covenants and the Utah Supreme Court's holding in *Swenson I*, and was effective to terminate the Covenants. Therefore, we affirm the trial court's dismissal with prejudice of the Swensons' complaint against Defendants.

¶ 17 WE CONCUR: PAMELA T. GREENWOOD, Associate Presiding Judge and JUDITH M. BILLINGS, Judge.