2007 UT 76

**David SWENSON and Barbara Swenson, Plaintiffs and Petitioners,**

v.

**David V. ERICKSON and David R. Limberg, Defendants and Respondents.**

**No. 20060190.**

Supreme Court of Utah.

Sept. 21, 2007.

Rehearing Denied Oct. 31, 2007.

See also 998 P.2d 807.

Budge W. Call, Salt Lake City, for plaintiffs.

J. Thomas Bowen, Midvale, for defendants.

On Certiorari to the Utah Court of Appeals

NEHRING, Justice:

¶ 1 On this, their second visit to this court, the plaintiffs provide us with the opportunity to hold that, in ruling on their first appeal in *Swenson v. Erickson (Swenson I)*, 2000 UT 16, ¶ 34, 998 P.2d 807, we intended to permit the property owners in the Quail Point Subdivision to vote to change their restrictive covenants on January 1, 2004, during the daylight hours and not just within the sixty seconds between midnight and 12:01 a.m.

**BACKGROUND**

¶ 2 With a brief chronicle of events, we endeavor to explain how a dispute between aggrieved property owners could produce the issue before this court and the odd outcome advocated by one of the parties. David and Barbara Swenson, David Limberg, and David Erickson own adjacent lots in the Quail Point Subdivision in Sandy, Utah. The subdivision is subject to restrictive covenants that were recorded in July 1973. In 1997 Mr. Erickson began constructing a shed on his property,

allegedly in violation of the neighborhood's restrictive covenants. The Swensons filed suit in district court seeking an injunction barring Mr. Erickson from completing the shed. The district court granted the Swensons' request and held that the structure violated the subdivision's restrictive covenants that state in part, "No structure shall be erected, altered, placed or permitted to remain on any 'residential lot' other than one detached single family dwelling, a private garage, a guest house, and outbuildings for pets as hereinafter described." *Swenson I,* 2000 UT 16, ¶ 5, 998 P.2d 807.

¶ 3 Mr. Erickson changed tactics and sought to terminate the restrictive covenants that barred his proposed construction project. A majority of the Quail Point property owners supported the termination and, after a vote on the issue, filed a notice of termination with the Salt Lake County Recorder dated October 3, 1997. Believing he had cleared the way to finish construction on his building, Mr. Erickson moved to dismiss the Swensons' lawsuit and lift the injunction. The district court granted the motion, and the Swensons appealed.

¶ 4 In *Swenson I,* we held that by their own terms the restrictive covenants were immune from termination except on January 1, 2004, the date on which the covenants would automatically renew unless modified or terminated. Mr. Erickson waited. When New Year's Day of 2004 finally arrived, he and the other Quail Point property owners met at noon. By 2:00 p.m., they had once again voted to terminate the restrictive covenants. After the vote, the property owners recorded another notice of termination in March.

¶ 5 The Swensons countered the renewed notice with another lawsuit. This time, the Swensons sought to invalidate the termination of the restrictive covenants by arguing that the covenants permitted their provisions only to change and not to terminate and that the covenants had already automatically renewed by the time the termination vote took place. The district court rejected both arguments, and the Swensons appealed. The court of appeals affirmed. *Swenson v. Erickson (Swenson II),* 2006 UT App 34, ¶ 1,

131 P.3d 267. The Swensons sought certiorari review in this court. We granted the Swensons' petition to determine whether the Quail Point property owners voted too late to change the subdivision's bylaws and must wait another ten years. We affirm.

## DISCUSSION

¶ 6 This review tows a considerable history behind it as it arrives in this court, which makes our approach to this case unusual and substantially limits this decision's precedential value. As is our practice, we review the court of appeals' decision and not the ruling of the district court. *E.g., Colosimo v. Roman Catholic Bishop of Salt Lake City,* 2007 UT 25, ¶ 11, 156 P.3d 806. We cede no deference to the court of appeals with regard to the two sources we consider to resolve the issue before us: the plain language of the restrictive covenants and the meaning of *Swenson I.*

¶ 7 We are mindful that many covenants may exist within the borders of our state that provide for their modification and renewal in language that is identical or similar to that used for Quail Point. Our approach to this case may not be helpful, however, in guiding someone who desires to modify or terminate such covenants toward the lawful achievement of that goal. The holding in *Swenson I* emerged from a traditional contract analysis that focused on the covenant's text. Although in this appeal we again look to the same covenants, we do so while considering an issue—what procedures the restrictive covenants require to conduct a lawful termination vote—that we did not confront in *Swenson I.*

¶ 8 Considering the holding in *Swenson I* clearly anticipated a renewed effort to terminate the restrictive covenants, we commented in the form of dictum on the occasion for that vote and noted, "[W]e assume that the next such time [to terminate the covenants] will be on January 1, 2004." *Swenson I,* 2000 UT 16, ¶ 34, 998 P.2d 807. Whether styled as dictum or otherwise, our remarks on the timing of a subsequent vote and the fate of the covenants clearly appear to have influenced the scheduling of the 2004 vote, and we must account for those remarks here.

We do not, therefore, express our view here of the legitimacy of the 2004 Quail Point vote based on the text of the covenants themselves using our traditional methods of contract analysis. Instead we consider this challenge in light of our pronouncement in *Swenson I* regarding how a legitimate covenant vote might take place. This same challenge confronted the court of appeals, and we conclude that it met that challenge and therefore affirm.

¶ 9 We begin our analysis by returning to the relevant text of the restrictive covenants. Article XIV provides:

> These covenants are to run with the land and shall be binding on all parties claiming under them until January 1, 1994, at which time said covenants shall be automatically extended for successive periods of 10 years unless by vote of a majority of the then owners of the building sites covered by these covenants it is agreed to change said covenants in whole or part.

*Id.* ¶ 33. Embedded within article XIV are three concepts that reflect the intent of the parties to the restrictive covenants: an affirmation of the right to modify the covenants, a belief that the interests of the Quail Point property owners would best be served by predictability that would be provided by covenants featuring a minimum ten-year life that would automatically renew unless modified, and a recognition that the property owners empowered to change the covenants should be limited to those most likely to be affected by the modifications. Our approach to the problem that we faced in *Swenson I* implicitly honored each of these principles. We acknowledged that the covenants could be modified but not by an executory action taken more than six years before the effective date of the modifications. Now we are faced with the task of applying these principles to determine voting rules that are both permitted by article XIV and not offensive to *Swenson I.* According to the Swensons, the sole procedure that achieves this end is one that limits the time for an effective vote to terminate the restrictive covenants to the sixty seconds after the beginning of 2004 but before the automatic extension of the covenants at 12:01 a.m. We disagree.

¶ 10 The Swensons' preferred voting procedure comes closest to achieving certainty that only those property owners most likely to be bound by changes to the restrictive covenants would be empowered to enact those changes. A perfect convergence of ownership and effectiveness would occur if a vote were taken at the instant before the covenants automatically renewed. Such perfection cannot practically be achieved. Even armed with the most sophisticated clock and impeccable choreography, it is simply beyond the capability of human beings to exercise their collective will under these constraints. The Swensons' narrow window similarly promises to make a lawful vote all but impossible before 12:01 a.m. arrives to rescue the covenants for another ten years from the reach of those who would modify them. The obvious problem with the Swensons' position is that it wholly disregards the first principle of article XIV—the parties to the covenants intended that they could be modified. In our view, hyperattentiveness to automatic renewal and voting eligibility renders the covenants impossible to modify and therefore offends the clear intentions of the parties to the covenants.

¶ 11 We signaled as much when we indicated in *Swenson I* that we assumed the Quail Point property owners could modify or terminate the covenants on January 1, 2004. In the view of the *Swenson I* court, the property owners had twenty-four hours available to them every ten years to conduct the business associated with modifying or terminating the covenants. We reaffirm that view today.

## CONCLUSION

¶ 12 By interpreting article XIV to permit a vote to occur at any time on January 1, we provide a voting window that fairly accommodates each of the principles informing article XIV and thereby conforms to the intent of the parties to the covenants. We accordingly affirm the judgment of the court of appeals.

¶ 13 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice DURRANT, and Justice PARRISH concur in Justice NEHRING's opinion.