2005 UT 41

**Steven MOUTY, Rick Burrell, Barbara Peterson, Gerald Jantz, Ted Brown, and Save Our Communities, Inc., Petitioners,**

v.

**THE SANDY CITY RECORDER and Sandy City, a municipal corporation, Respondents.**

No. 20050101.

Supreme Court of Utah.

July 1, 2005.

Rehearing Denied Sept. 21, 2005.

Robert H. Hughes, Salt Lake City, for petitioners.

Walter R. Miller, Sandy, for respondents.

Stephen K. Christensen, Jeffery S. Williams, Salt Lake City, for the Boyer Company.

Mark E. Hindley, Salt Lake City, for Gibbons Realty Company.

Vincent C. Rampton, Salt Lake City, for Lowe's.

DURRANT, Justice:

¶ 1 To resolve the present controversy, we must determine whether a city ordinance that amends the permitted and prohibited uses of land in a particular zoning category can be subjected to the referendum process. If the ordinance in question is referable, we must then determine whether the ordinance is a "land use law," a class of referable laws subject to a higher signature threshold than generally required. We conclude that the ordinance is referable and that it is not a "land use law."

## BACKGROUND

¶ 2 At stake in this case is whether the voters of Sandy City, Utah, will be given the opportunity to hold a referendum on an amendment to one of the city's zoning categories. If the amendment is not rejected via referendum, a large parcel of land in the city may ultimately serve as the location of a commercial complex featuring at least two prominent "big box" retailers.[1] The parcel in question (the "Gravel Pit") is approximately 100 acres in size and for many years served as a source for sand and gravel products.

¶ 3 In 1988, Sandy City created a new zoning category specifically for the Gravel Pit. That category, termed "Special District Mixed Use—SD–X—Ski Connect" ("SD–X Zone"), was only applied to the Gravel Pit, and the Gravel Pit remains the only parcel of land that is classified as an SD–X Zone. At the time of its creation, the SD–X Zone permitted nine uses and prohibited twenty-six. Among the prohibited uses was use of the parcel for a "Hardware/Building/Home Improvement Store, or a combined Drug/Variety/Garden Center." Sandy City, Utah, Municipal Code § 15–29–20(c)(3) (2002). Discount or department stores, as well as supermarkets, were also prohibited. *Id.*

---

1. The term "big box" refers to the type of structure such retailers typically occupy. *See* Benjamin B. Quinones, *Redevelopment Redefined: Revitalizing the Central City with Resident Control,* 27 U. Mich. J.L. Reform 689, 725 n. 133 (1994)

(" 'Big box retail' refers to the many types of retail entities that typically sell low cost goods out of glorified warehouse-type spaces. The store is in effect a big box.").

¶4 In April 2004, The Boyer Company ("Boyer") contacted Sandy City via letter and requested that the ordinance outlining the permitted and prohibited uses of land classified as an SD–X Zone be amended to allow a substantial commercial development project on the site of the Gravel Pit. The development project, as contemplated by Boyer, would include big-box retailers Wal–Mart and Lowe's. Sandy City considered Boyer's request, and the city's planning commission and city council both held multiple public hearings and meetings at which members of the public were invited to voice their opinions about amending the SD–X Zone category to permit such a development project.

¶5 In the summer of 2004, several Sandy City residents and business people formed Save Our Communities, Inc. ("SOC"), intending to fight the proposed development of the Gravel Pit. Although SOC now states that it considered the approval of the SD–X Zone amendment to be "predetermined," SOC actively opposed the amendment by participating in the public hearings and meetings leading up to the amendment's passage. SOC also voiced its opposition to the amendment by sending letters to both the planning commission and the city council. After the public hearings and meetings were concluded, and approximately seven months after Sandy City initially received Boyer's request for an amendment of the SD–X Zone category, the Sandy City Council enacted Ordinance No. 04–45, which amended the SD–X Zone category to allow the development activity proposed by Boyer.[2]

¶6 Just over a week after the ordinance was passed, SOC submitted an application for a referendum petition to the Sandy City Recorder, hoping to obtain enough signatures to subject Ordinance No. 04–45 to a referendum vote. Approximately one month later, SOC completed its signature drive and submitted signed and verified petition packets to the Sandy City Recorder. During the course of its drive, SOC was able to secure over 8,000 signatures. However, when seeking signatories to a petition, not all signatures are created equal, as only signatures by legal Utah voters[3] residing within the local jurisdiction are counted toward the required signature number. Utah Code Ann. § 20A–7–605(1) (2003). Therefore, pursuant to section 20A–7–606 of the Utah Code, *id.* § 20A–7–606, the SOC petition packets were delivered to the Salt Lake County Clerk's Office for signature certification.

¶7 After the signature certification process was complete, the Salt Lake County Clerk forwarded the SOC petition packets to the Sandy City Recorder for a final signature count. Typically, the number of valid signatures that a party must obtain in order to force a referendum on a legislative action taken by a city is equivalent to at least ten percent of the total number of local voters who cast votes for candidates in the last gubernatorial election, assuming the total number of votes cast in that city exceeded 25,000. *Id.* § 20A–7–601(1)(a) (Supp.2004). However, because the Sandy City Recorder determined that Ordinance No. 04–45 is a "land use law," the SOC petition packets were subjected to the doubly demanding twenty percent requirement applicable to such laws. *See id.* § 20A–7–601(2)(b).

¶8 Informed by the Salt Lake County Clerk's Office that 39,700 Sandy voters had participated in the last gubernatorial election, the Sandy City Recorder determined that 7,940 legal signatures—twenty percent of the total number of local voter participants in the last gubernatorial election—were required in order to force a referendum on Ordinance No. 04–45. The Sandy City Recorder then counted the number of signatures certified by the Salt Lake County Clerk's Office and concluded that SOC had obtained 6,425 valid signatures. Because SOC failed to meet the twenty percent signature requirement, the Sandy City Recorder

---

2. No party to the current petition has made any allegation that the procedure followed by Sandy City in passing Ordinance No. 04–45 was deficient in any manner. Rather, it appears from the documentary evidence supplied by the parties that Sandy City actually exceeded notification and public participation requirements.

3. The Utah Code defines a "legal voter" as one who either is registered to vote at the time of signing the referendum petition or becomes registered before the petition signatures are certified. Utah Code Ann. § 20A–7–101(6) (2003).

refused to accept and file SOC's referendum petition.

¶ 9 SOC subsequently pursued its right to seek an extraordinary writ in this court compelling the Sandy City Recorder to accept and file its referendum petition.[4] *See id.* § 20A–7–607(4)(a) (2003) ("If the local clerk refuses to accept and file any referendum petition, any voter may apply to the Supreme Court for an extraordinary writ to compel him to do so...."). In its petition, SOC contends that the Sandy City Recorder erroneously concluded that Ordinance No. 04–45 is a "land use law" and therefore improperly subjected SOC's referendum petition to the higher twenty percent signature requirement. In response, Sandy City argues that Ordinance No. 04–45 is not referable to the voters at all because it is an individual property zoning decision and therefore immune from the referendum process, and that, even if the ordinance is referable, the Sandy City Recorder correctly determined that the ordinance is a "land use law," and that SOC was therefore properly obligated to meet the more stringent twenty percent signature requirement.

 ¶ 10 Typically, this court exercises appellate jurisdiction, reviewing the decisions of the state's district courts and those of the Utah Court of Appeals. However, this court has original jurisdiction over certain matters, including petitions for extraordinary writs. *Id.* § 78–2–2(2) (2002). In such situations, we do not conduct a review in our appellate capacity, but rather serve as the forum in which claims are initially heard. We have jurisdiction over this matter pursuant to Utah Code section 78–2–2(2) (2002).

## STANDARD OF REVIEW

 ¶ 11 Because there are no disputed material facts, our review in this matter is confined to discerning the proper interpretation of various provisions of the Utah Code. We conduct our review for correctness and grant no deference to the Sandy City Recorder's legal determinations. *See Tobias v. S. Jordan City Recorder,* 972 P.2d 373, 373–75 (Utah 1998) (conducting a correctness review and granting no deference to a city recorder's determination that an application for a referendum petition was not timely filed).

## ANALYSIS

¶ 12 In order to ascertain whether it is appropriate to issue a writ compelling the Sandy City Recorder to accept and file SOC's referendum petition, we must determine the following: (1) whether Ordinance No. 04–45 is referable to Sandy City voters at all, and, if so, (2) whether that ordinance is a "land use law," requiring SOC to obtain twice the number of signatures typically necessary before a referendum petition is deemed legally sufficient. We address each of these issues below. However, we first respond to Boyer's suggestion that, because Boyer's applications for the development of the Gravel Pit have now been accepted by Sandy City, the vested rights doctrine precludes the possibility of a referendum and that the current controversy is therefore moot.

## I. THE VESTED RIGHTS DOCTRINE DOES NOT RENDER THE CURRENT CONTROVERSY MOOT

 ¶ 13 Boyer claims that SOC's petition is moot because Boyer has now obtained vested development rights that cannot be disturbed by referendum.[5] The only legal authority Boyer cites in support of its mootness claim is *Western Land Equities, Inc. v. City of Logan,* 617 P.2d 388 (Utah 1980). In that case, we held "that an applicant is entitled to a building permit or subdivision ap-

---

4. Several individuals joined SOC in petitioning this court for extraordinary relief. However, as the position and interests of the individual petitioners are aligned with those of SOC, for convenience we refer to petitioners collectively as "SOC." Additionally, we note that Sandy City, Boyer, and Gibbons Realty Co. have submitted memorandums opposing SOC's request for an extraordinary writ.

5. Prior to the completion of the signature certification process, SOC filed suit in the district court seeking to enjoin Sandy City from granting any development approvals pertaining to the Gravel Pit until the referendum process had been completed. For reasons undisclosed by the record, the district court proceedings were subsequently stayed "until further request of counsel."

proval if his proposed development meets the zoning requirements in existence at the time of his application and if he proceeds with reasonable diligence, absent a compelling, countervailing public interest." *Id.* at 396. We went on to provide, however, that an applicant is not entitled to rely on zoning ordinances in effect at the time of application if "proceedings to amend [those] zoning ordinances" are underway. *Id.* The latter limitation resonates nicely with estoppel principles, which provide the primary policy rationale underlying the development of the rule articulated in *Western Land Equities. See id.* at 391–93 (describing "zoning estoppel" and stating that it would be unfair to disallow development when an applicant has, reasonably and in good faith, detrimentally relied on government acts or omissions in pursuing what was perceived as a valid development project).

¶ 14 In the present case, we are not persuaded that the rule announced in *Western Land Equities* serves to protect Boyer from the possibility of a referendum. To begin with, documentary evidence provided to this court establishes that SOC's efforts to pursue a referendum on Ordinance No. 04–45 were well known, making any reliance by Boyer on the validity and unassailability of Ordinance No. 04–45 unreasonable under the circumstances. We additionally note that the Utah Constitution provides that the residents of a municipality have the right to "require any law or ordinance passed by the law making body of the county, city, or town to be submitted to the voters thereof, as provided by statute, *before the law or ordinance may take effect.*" Utah Const. art. VI, § 1(2)(b)(ii) (emphasis added). In other words, article VI prevents referable laws from taking effect until local voters have had the opportunity to exercise their right to seek a referendum. In the case at hand, local citizens initiated the referendum process, forestalling the effective date of Ordinance No. 04–45. Sandy City may have approved development applications that were in conformity with newly-enacted zoning requirements, but considering that the effective date of those requirements was tolled pending the exercise of the referendum right, the new zoning requirements had not yet taken

effect. Consequently, the development applications were not in conformity with "the zoning requirements in existence at the time of ... application." *Western Land Equities,* 617 P.2d at 396.

¶ 15 Also, this case presents a situation in which a compelling, countervailing public interest exists, which defeats any operation of the vested rights doctrine. Although our opinion in *Western Land Equities* touched directly only on countervailing public interests involving the appropriate use of cities' police powers, we conclude that the exercise of the people's referendum right is of such importance that it properly overrides "individual economic interests." *Id.* To hold otherwise would lead to an absurd legal landscape where a municipality could circumvent the people's referendum right by enacting a legislative change—no matter how comprehensive—to zoning categories and then quickly approving development applications under the new legislation. Such a situation would make hollow the constitutional guarantee that the people of this state retain direct legislative power. The referendum right, so fundamental to our conception of government, should not and cannot be so easily thwarted.

¶ 16 Having concluded that the issues raised by SOC's petition are not moot, we now analyze (1) whether Ordinance No. 04–45 is referable to the voters of Sandy City, and, if so, (2) whether Ordinance No. 04–45 is a "land use law" triggering the heightened twenty percent signature requirement applicable to such laws.

## II. ORDINANCE NO. 04–45 IS REFERABLE TO THE VOTERS OF SANDY CITY

¶ 17 Determining whether SOC can seek a referendum on Ordinance No. 04–45 requires an analysis of various sections of the Utah Code. When interpreting statutory law, our "primary goal ... is to give effect to the legislative intent, as evidenced by the plain language, in light of the purpose the statute was meant to achieve." *Foutz v. City of S. Jordan,* 2004 UT 75, ¶ 11, 100 P.3d 1171 (internal quotation omitted). We also "as-

sume that each term included in the [statute] was used advisedly." *Carrier v. Salt Lake County,* 2004 UT 98, ¶ 30, 104 P.3d 1208. "Only if the language of a statute is ambiguous do we resort to other modes of construction." *O'Keefe v. Utah State Ret. Bd.,* 956 P.2d 279, 281 (Utah 1998). We also note that the present controversy implicates title 20A of the Utah Code, which, pursuant to the instructions of the legislature, we are to "construe ... liberally to carry out the intent of [the] title." Utah Code Ann. § 20A-1–401(1) (2003); *see Adams v. Swensen,* 2005 UT 8, ¶ 17, 108 P.3d 725 ("[W]hen confronted with malleable statutory language, our shaping of its meaning will be guided by the policy of encouraging ballot access...."). Keeping these principles in mind, we now turn our analysis to the relevant statutory provisions.

¶ 18 The Utah Legislature's authority to regulate referendum procedures derives from the Utah Constitution, which provides that

> [t]he legal voters of any county, city, or town, in the numbers, under the conditions, in the manner, and within the time provided by statute, may ... require any law or ordinance passed by the law making body of the county, city, or town to be submitted to the voters thereof, as provided by statute, before the law or ordinance may take effect.

Utah Const. art. VI, § 1(2)(b). Pursuant to this grant of authority, the legislature has outlined by statute the mechanisms by which the people can exercise their constitutionally guaranteed local referendum right. *See generally* Utah Code Ann. §§ 20A-7-601 to -612 (2003 & Supp.2004).

¶ 19 Section 20A-7-601 provides that "a person seeking to have a law passed by the local legislative body submitted to a vote of the people shall obtain" the signatures of a specified percentage of the total number of local voters who cast votes for a candidate in the last gubernatorial election. *Id.* § 20A-7–601(1) (Supp.2004). The statutory scheme appears simple at first blush. A quick and superficial reading of section 20A-7-601 would lead one to conclude that any municipal ordinance is referable to local voters so long as a statutorily-set number of signatures can be obtained. However, the history underlying the development of the statutory scheme, and our case law interpreting that development, complicate our state's facially facile local referendum procedure. This reality requires that we carefully analyze the manner in which Ordinance No. 04–45 interacts with local referendum procedures, if at all.

¶ 20 Sandy City argues that Ordinance No. 04–45 falls entirely outside the purview of section 20A-7-601. According to Sandy City, section 20A-7-601 limits the universe of referable acts to those acts that meet the statutory definition of a "local law." [6] In making its argument, Sandy City points out that the legislature specifically excluded "individual property zoning decisions" from the definition of "local law," *id.* § 20A-7-101(7)(b) (2003), and contends that Ordinance No. 04–45 is an individual property zoning decision. Therefore, Sandy City argues, Ordinance No. 04–45 cannot be subjected to the referendum process because it is not a "local law," but an "individual property zoning decision." If Ordinance No. 04–45 is, indeed, an individual property zoning decision, Sandy City's logic would be unassailable. However, we disagree with Sandy City's blanket assertion that Ordinance No. 04–45 is an individual property zoning decision. [7]

---

6. We note that Sandy City's contention that section 20A-7-601 is so confined, while arguably correct, seems a somewhat strained reading of the statute given that section 20A-7-601 does not use the term "local law" when outlining the general scope of its applicability. Instead, the statute uses the phrase "law passed by the local legislative body," which SOC argues is not necessarily equivalent to the term "local law." In any event, we have no need to resolve this particular disagreement because, even assuming that section 20A-7-601 is only applicable to "local

laws," we conclude that Ordinance No. 04–45 is a "local law" and subject to the referenda procedures outlined in section 20A-7-601.

7. Sandy City contends that SOC, in its briefing before this court, conceded that Ordinance No. 04–45 is an individual property zoning decision. According to Sandy City, that concession, coupled with its own position that section 20A-7-601 applies only to "local laws," compels the conclusion that Ordinance No. 04–45 is not referable. We disagree that SOC has conceded

¶ 21 In *Citizen's Awareness Now v. Marakis*, 873 P.2d 1117 (Utah 1994), we were called upon to determine "the nature and scope of an 'individual property zoning decision' under section 20–11–24(2)(a)(ii) [of the Utah Code]." *Id.* at 1121. Similar in all material respects to the definition of "local law" now found in section 20A–7–101(7), the section analyzed in *Marakis* excluded "individual property zoning decisions" from the definition of "law or ordinance." [8]

■ ¶ 22 As we stated in *Marakis*, by excluding "individual property zoning decisions" from the definition of "law or ordinance," the legislature intended to incorporate our case law on the referability of municipal zoning actions. 873 P.2d at 1122 (citing Floor Debate, vote on S.B. 9, 47th Utah Legis., Gen. Sess. (Feb. 9, 1987) (Senate Recording No. 54, side B) (statement of Sen. Finlinson)). Specifically, we concluded that the exclusion of "individual property zoning decisions" was an attempt to codify our determination that administrative zoning matters are not referable to the voters as a matter of constitutional right while legislative zoning matters are referable. *See id.; see also Wilson v. Manning*, 657 P.2d 251, 252–53 (Utah 1982) (outlining the constitutional interpretation that gave rise to the administrative-legislative distinction). Consequently, in *Marakis*, we held that the general language used to define "law or ordinance," and which is now used to define "local law" in the present statutory scheme, "corresponds to legislative zoning matters that are subject to referenda." 873 P.2d at

1122. We went on to state that the exclusion of "individual property zoning decisions" from the definition of "law or ordinance" was intended by the legislature to "refer[ ] to administrative zoning changes," which are exempt from referenda. *Id.*

¶ 23 Unfortunately, as we acknowledged in *Marakis*, the statutory incorporation of our case law addressing the appropriateness of referring zoning matters to local voters "failed to remedy a shortcoming in that case law." *Id.* Specifically, while the statutory scheme expressly excluded administrative zoning matters from the referendum process, there remained no clear mechanism by which to determine whether a particular zoning act was administrative or legislative. *See id.* In *Marakis*, we supplied that mechanism, identifying particular areas of inquiry that must be assessed before determining whether a particular zoning act is administrative (and therefore nonreferable) or legislative (and therefore referable). *Id.* at 1122–26.

¶ 24 Given our decision in *Marakis*, it would seem to be a foregone conclusion that determining whether Ordinance No. 04–45 is referable simply involves applying the *Marakis* test, which was designed to answer such questions. However, both Sandy City and SOC contend that conducting the admittedly fact-intensive analysis prescribed by *Marakis*[9] is not necessary in the present case.

¶ 25 Sandy City argues that a *Marakis* analysis is unnecessary because the legislature effectively overruled *Marakis* when it

---

such a critical component of its argument. Although SOC's briefs do emphasize that Ordinance No. 04–45 affected only one parcel of land, SOC's pleadings before this court cannot be fairly read as conceding that the ordinance in question is an individual property zoning decision as that phrase is used in chapter 7 of title 20A. Consequently, we reject Sandy City's argument that SOC has conceded that Ordinance No. 04–45 is nonreferable.

8. The statute at issue in *Marakis* was repealed in 1994, *see* Act of Jan. 27, 1994, 1994 Utah Laws 61, but the exclusion of "individual property zoning decisions" from the definition of "law or ordinance" was recodified in section 20A–7–101(7)(b), *id.* § 9, 1994 Utah Laws at 69 (codified at Utah Code Ann. § 20A–7–101(7)(b) (2003)). A

subsequent revision retained the exclusion of "individual property zoning decisions," but amended "law or ordinance" to read "local law." *See* Act of Mar. 1, 1994, sec. 30, § 20A–7–101(7)(b), 1994 Utah Laws 247, 262. In other words, while the defined term has changed, the definition has remained the same.

9. *See* J.R. Kemper, Annotation, *Adoption of Zoning Ordinance or Amendment Thereto as Subject of Referendum*, 72 A.L.R.3d 1030 § 2, at 1035 (1976) [hereinafter Kemper] ("Although the legislative-administrative distinction is difficult to apply in almost any context, it is especially so in connection with zoning enactments, which involve an unending variety of factual circumstances and relate to peculiarly local matters.").

amended section 20A–7–601 in 1999. According to Sandy City, at that time, the legislature sought to eliminate the need for a *Marakis* analysis by listing in the referendum statute itself the type of "zoning matters" that are amenable to the referendum process. The amendment in question added a new subsection to section 20A–7–601 that provides heightened signature requirements before a referendum can be held on a "land use law passed by the local legislative body." Utah Code Ann. § 20A–7–601(2)(b) (Supp. 2004). The subsection states that, "[a]s used in this Subsection (2), 'land use law' includes a land use development code, an annexation ordinance, and comprehensive zoning ordinances." *Id.* § 20A–7–601(2)(a). Sandy City argues that the legislature intended the phrase "land use law" to cover every referable municipal zoning act and that the legislature therefore intended to impose the higher twenty percent signature requirement on all referable zoning actions. Therefore, according to Sandy City, even if Ordinance No. 04–45 is referable, it is by default a "land use law," and SOC was obligated to meet the higher twenty percent signature requirement. Because SOC failed to meet that higher signature threshold, Sandy City argues that it is unnecessary to conduct a *Marakis* analysis as, even were we to conclude that Ordinance No. 04–45 is referable, SOC nevertheless failed to submit a legally sufficient referendum petition.

■ ¶ 26 We acknowledge that Sandy City's approach is grounded in a common-sense understanding of the phrase "land use law." After all, any ordinance that affects zoning almost certainly affects the use of land. However, as we recently pointed out in *Carrier*, determining the meaning of a particular phrase in a statute or ordinance is largely a contextual matter. 2004 UT 98 at ¶ 32, 104 P.3d 1208 ("In its broadest sense, the term 'mineral' necessarily encompasses the term 'gravel.' Whether the term 'mineral' actually incorporates the term 'gravel' in any given situation, however, is largely contextual." (citation omitted)).

¶ 27 We are unpersuaded that, when considered in context, the 1999 amendment was intended to eliminate the need for a *Marakis*

analysis in zoning matters and that the amendment contemplated subjecting all referable municipal zoning actions to the higher twenty percent signature requirement. There is simply nothing in the language of the amendment that evidences an intent to limit the types of municipal zoning actions that can be referred to the local voters. Rather, the 1999 amendment appears to be an attempt to raise the hurdle local voters must leap when they seek a referendum on a municipal zoning action that falls within a specific category of zoning actions, namely, "land use laws." We also note that the legislative history relating to the 1999 amendment is devoid of any indication that the amendment was an attempt to do away with our line of cases addressing whether a particular zoning action is administrative or legislative. *See* Floor Debate, vote on Sub. H.B. 129, 53rd Utah Legis. Gen. Sess. (March 1, 1999) (Senate Recording No. 47, side A). In the absence of textual evidence or legislative history that lends meaningful support to Sandy City's interpretation of the 1999 amendment, we feel compelled to reject that interpretation.

■ ¶ 28 Like Sandy City, SOC also argues that a *Marakis* analysis is not necessary under the facts of this case. However, unlike the approach advocated by Sandy City, SOC's argument is grounded in the Optional Forms of Municipal Government Act ("OFMGA"). Utah Code Ann. §§ 10–3–101 to –1312 (2003 & Supp.2004). According to SOC, the fact that Sandy City has adopted the council-mayor form of government, as allowed by the OFMGA, necessarily solves the administrative-legislative quandary typically faced in zoning referendum situations. SOC argues that the council-mayor form of government provides for a strict separation of governmental powers, by which the city council is foreclosed from undertaking any action that is not, by definition, legislative. We agree with SOC, and hold that zoning actions properly taken by a city council operating under the council-mayor form of government are necessarily legislative and therefore subject to referenda.

¶ 29 There is support for this conclusion both in the text of the OFMGA and in our

case law interpreting that act's provisions. *See, e.g., id.* § 10–3–101(2) (Supp.2004) ("The government of a municipality operating under the council-mayor form of government is vested in two separate, independent, and equal branches of municipal government consisting of ... the mayor, who exercises executive powers ... and ... a council of five or seven members, who exercise the legislative powers."); *Martindale v. Anderson,* 581 P.2d 1022, 1027 (Utah 1978) (noting that the council-mayor form of government "specifically vest[s] the whole of the executive powers in the Mayor and only the legislative powers in the Council" and that it "is a true separation of powers form of government").

¶ 30 Consistent with that understanding of the council-mayor form of government, decisions from this court, as well as those from the court of appeals, involving the council-mayor form have taken pains to confine the coequal branches to their respective spheres. *See Sandy City v. Salt Lake County,* 827 P.2d 212, 221 (Utah 1992) ("As legislative functions, the powers of zoning and rezoning cannot be delegated to a quasi-judicial body such as a board of adjustment."); *Scherbel v. Salt Lake City Corp.,* 758 P.2d 897, 898–99 (Utah 1988) (holding that appeals from a planning commission's denial of building permits cannot be heard by a city council in a council-mayor municipality because "the authority to resolve zoning disputes is properly an executive function rather than a legislative one"); *Salt Lake County Cottonwood Sanitary Dist. v. Sandy City,* 879 P.2d 1379, 1383 (Utah Ct.App.1994) (holding that the Sandy City Council cannot perform the executive function of hearing appeals from grants of conditional use permits).

¶ 31 Further, the existence of the council-mayor form of government undercuts a pri-

mary rationale for the very creation of the administrative-legislative dichotomy. In *Wilson,* we acknowledged that the initial need to formulate a distinction between administrative zoning acts and legislative zoning acts "was doubtless made necessary by the fact that some lawmaking bodies ... act in an executive or administrative as well as a legislative capacity." 657 P.2d at 252.

¶ 32 *Wilson* strongly implies that our case law developing the administrative-legislative dichotomy was motivated by the need to determine which hat a governing body empowered with both administrative and legislative authority was wearing at the time a particular action was taken. However, we are cognizant that other factors counseled in favor of creating the administrative-legislative distinction. For example, we have been hesitant to hold that an unqualified referendum right extends to municipal considerations involving necessarily complex issues, as the resolution of such matters may be best left to the mechanisms generally employed by municipal governments. *See Shriver v. Bench,* 6 Utah 2d 329, 313 P.2d 475, 478 (1957) (stating that an ordinance fixing salaries for fire and police personnel "presents a problem of such complexity that it is not practical for the public to give it sufficient time and attention to make a proper determination of the matter"). We reaffirmed this concern in *Marakis,* when we expressly made the complexity of the zoning issue in question a relevant factor to consider when determining whether the matter should be referable. 873 P.2d at 1125.[10]

¶ 33 Another concern underlying our previous opinions is the potential for havoc in municipal land use policy should an unchecked referendum power be given full freedom to operate. *See id.* 873 P.2d at 1125 (opining that "the undesirable phenomenon

10. Some jurisdictions have found that zoning matters are so complex and critical to municipal functioning that they should be excluded from the referendum process altogether. *See generally* Kemper, *supra* note 9, § 6 (1976 & Supp.2002) (collecting cases). For example, in *Township of Sparta v. Spillane,* 125 N.J.Super. 519, 312 A.2d 154 (App.Div.1973), the court held that the state legislature of New Jersey granted zoning power to the state's municipal governments and that the state act granting voters the referendum right did

not supercede the exclusive grant of zoning authority. *Id.* at 156–58. The court recognized that "the ultimate question is whether major decisions should be made by the planning boards and governing bodies ... or whether they should be open to a final decision by the vote of the entire population." *Id.* at 156. We note, however, that cases from outside our jurisdiction are of limited value in this arena, as the nature of the referendum right and zoning processes differ widely from state to state.

of city government by referendum" is "inefficient" and "arbitrary"); *Bird v. Sorenson*, 16 Utah 2d 1, 394 P.2d 808, 808 (1964) ("If each change in a zoning classification were to be submitted to a vote of the city electors, any master plan would be rendered inoperative.").

¶ 34 Despite the above concerns, we are mindful that our state constitution retains for the people a relatively broad referendum power, which we have previously interpreted as extending to all legislative acts taken by a municipal government. *See, e.g., Wilson*, 657 P.2d at 252 ("The meaning of [the referendum] guarantee [has been] definitively construed . . . ."). We are also mindful that the legislature has allocated only legislative authority to city councils operating under the council-mayor form of government, *see* Utah Code Ann. § 10–3–101(2), and that the legislature has previously endorsed our line of cases concluding that legislative zoning acts are subject to referenda, *see Marakis*, 873 P.2d at 1122. Consequently, it would be inconsistent with our prior case law to now hold that the people's referendum power does not extend to zoning actions taken by a city council operating under the council-mayor form of government.

¶ 35 In so concluding, we do not discount the gravity of the concerns identified above. Rather, we recognize that the approach outlined in *Marakis* has continuing applicability when it is necessary to determine whether a zoning action taken by a governing body empowered with both administrative and legislative authority is best categorized as administrative or legislative.[11] We also recognize that the above-identified policy concerns may be weighed by the legislature when contemplating the appropriateness of statutory restraints on the implementation of the referendum right. In this respect, we note that the current statutory scheme places significant checks on the referendum power in the form of signature requirements and procedural hurdles. As a result, we are confident that the ability to exercise the referen-

dum power over the full range of zoning matters acted upon by a city council organized under the council-mayor form of government will not wreak havoc upon the smooth operation of municipalities. As noted by Justice Howe, "[i]t will be only in a very few instances where aggrieved landowners or citizens will go to the expense and effort of obtaining a referendum." *Wilson*, 657 P.2d at 256 (Howe, J., dissenting).

¶ 36 The above considerations, coupled with the unquestionable reality that a bright-line rule establishing which municipal acts are referable would serve the interests of both the electorate and municipal governments, lead us to conclude that all acts taken by a city council in a city organized pursuant to the council-mayor form of government are necessarily legislative and subject to referenda. Having so concluded, we now discuss whether Ordinance No. 04–45 is a "land use law," a category of laws that the legislature has provided with heightened protection from the referendum process.

### III. ORDINANCE NO. 04–45 IS NOT A LAND USE LAW

¶ 37 Sandy City contends that, even if Ordinance No. 04–45 is referable, SOC's referendum petition was still properly rejected because SOC failed to meet the signature threshold applicable to referenda on "land use laws." SOC counters that Ordinance No. 04–45 is not a "land use law," and that SOC therefore obtained a sufficient number of signatures to refer the ordinance to the local voters. To resolve the parties' dispute, we must determine whether Ordinance No. 04–45 is a "land use law," as that term is used in section 20A–7–601(2).

¶ 38 Our "primary goal in interpreting statutes is to give effect to the legislative intent, as evidenced by the plain language, in light of the purpose the statute was meant to achieve." *Foutz v. City of S. Jordan*, 2004 UT 75, ¶ 11, 100 P.3d 1171 (internal quotation omitted). Section 20A–7–601(2) imposes an

---

11. We also note that the *Marakis* analysis may still have applicability to an action taken by a city council operating under the council-mayor form of government if, for example, that action is challenged on the ground that the city council acted beyond the scope of its legislative authority.

increased signature requirement on local voters seeking a referendum on a "land use law." The statute provides that a " 'land use law' includes a land use development code, an annexation ordinance, and comprehensive zoning ordinances." Utah Code Ann. § 20A–7–601(2)(a) (Supp.2004). Looking to the statute's plain language, we initially point out that Ordinance No. 04–45 is not "a land use development code" or a "comprehensive zoning ordinance," both of which refer to laws providing near-comprehensive regulation of land use within a municipality. *See, e.g.,* Sandy City, Utah, Municipal Code §§ 15–01–01 to 15–15–02 (2004) (Sandy City's Land Development Code); *see also id.* § 15–01–03 (2003) ("This Code shall establish Zone Districts within Sandy City. It shall provide regulations within said districts with respect to the use, location, height of buildings and structures, the use of land, the size of lots, yards and other open spaces, and the density of population.... [One purpose of this code is] [t]o establish a system of fair, comprehensive, consistent and equitable regulations, standards and procedures for review and approval of all proposed land development within the City."); 8 Eugene McQuillin, *The Law of Municipal Corporations* § 25.07, at 30 (rev.3d ed. 2000) ("Comprehensive zoning is general zoning throughout a municipality according to a comprehensive plan...."). It is even more clear that Ordinance No. 04–45 is not "an annexation ordinance," as it contemplates no annexation whatsoever.

¶ 39 However, the reality that Ordinance No. 04–45 does not fit into any of the three examples of "land use laws" identified by the legislature does not completely foreclose the possibility that the ordinance is, nevertheless, a "land use law." The legislature's use of the word "includes" indicates that the three examples listed were not necessarily meant to be exhaustive. It is a basic principle of statutory construction that, when confronted with a statute that uses a general term subsequently narrowed by specific examples, "the general term is understood as restricted to include things of the same kind, class, character, or nature as those specifically enumerated, unless there is something to show a contrary intent." *State v. A.T.,* 2001 UT 82, ¶ 12, 34 P.3d 228. The salient fea-

tures shared by the three examples listed in the statute are comprehensive scope and general applicability. All three of the examples listed by the legislature relate to situations in which a municipality has completed a highly involved undertaking, be it the development of a comprehensive zoning scheme or the annexation of property, and is attempting to finalize that process through a legislative act. Although even a text amendment to a zoning category can be a complicated and involved process, we are persuaded that such an amendment is not of the same character as the comprehensive acts listed in the statute.

¶ 40 We conclude that the legislature did not intend to include an amendment to a zoning category within the ambit of the term "land use law." Because SOC obtained 6,425 valid signatures, well above the applicable ten percent requirement established by the Utah Code, the Sandy City Recorder improperly refused to accept SOC's petition.

## CONCLUSION

¶ 41 We conclude that the Sandy City Council exercised its legislative authority when passing Ordinance No. 04–45. The Utah Constitution guarantees residents of Sandy City the right to refer that legislative action to the local voters. Additionally, we conclude that Ordinance No. 04–45 is not a "land use law," as that term is used in section 20A–7–601 of the Utah Code. Consequently, SOC exceeded statutory requirements for initiating a referendum by obtaining more than the ten percent signature threshold mandated by the Utah Code. We further hold that the vested rights doctrine does not operate in the current case to defeat the referendum right of Sandy City voters. As a result, we hereby order the Sandy City Recorder to accept and file SOC's petition for a referendum.

¶ 42 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice PARRISH, and Justice NEHRING concur in Justice DURRANT's opinion.