# 2021 UT App 9

## THE UTAH COURT OF APPEALS

RUSSELL WALKER, DENISE WALKER, BRYAN THOMAS, KAY THOMAS, TYLER HILTON, HEATHER HILTON, BRET BULLOCK, CAMILLE BULLOCK, DIANE L'ETOILE, ERIK NOLTE, JOSEPH MUSCOLINO, KAREN MUSCOLINO, STEVEN WALTERS, AND DAWN WALTERS,
Appellants,
*v.*
ZEUS LAND HOLDINGS LLC, JUPITER LAND 1 LLC, AND TITAN LAND HOLDINGS LLC,
Appellees.

Opinion
No. 20190962-CA
Filed February 4, 2021

Third District Court, Salt Lake Department
The Honorable James D. Gardner
No. 180903319

Russell S. Walker, Attorney for Appellants

E. Barney Gesas, Richard D. Burbidge, and Carolyn J. LeDuc, Attorneys for Appellees

JUDGE RYAN M. HARRIS authored this Opinion, in which JUDGES JILL M. POHLMAN and DIANA HAGEN concurred.

HARRIS, Judge:

¶1 Over opposition from many of its neighbors, a lot owner subdivided its lot into two smaller lots. After the lot owner completed its subdivision, some of the neighbors (Neighbors) sued, claiming that the subdivision violated restrictive covenants applicable to the property. The district court entered summary judgment in favor of the lot owner, determining that the subdivision did not violate the restrictive covenants. We affirm.

BACKGROUND

¶2     In 2017, Zeus Land Holdings LLC (Zeus) acquired a lot in a subdivision (the Subdivision) located in Salt Lake County, Utah, and just weeks later conveyed that lot to Jupiter Land 1 LLC (Jupiter).[1] Since the Subdivision's inception, its lots have been subject to a set of restrictive covenants (the CC&Rs). The original version of the CC&Rs, recorded in 1940, limited each lot to "one detached single family dwelling" and mandated that "[n]o lot shall be resubdivided to contain less than 20,000 square feet." The CC&Rs were to "run with the land" and "be binding on all" lot owners in the Subdivision "until January 1, 1965, at which time [the CC&Rs would] be automatically extended for successive periods of ten years unless by a vote of the majority of the then owners of the lots it [was] agreed to change [the CC&Rs] in whole or in part."

¶3     As relevant here, the lot owners of the Subdivision twice amended the CC&Rs. In 1964, the provision restricting further subdivision of lots was amended to reduce the minimum resubdivided lot size from 20,000 to 9,000 square feet. Then in 1978, the lot owners again lowered the minimum resubdivided lot size, this time lowering the limit to 8,000 square feet. Following those amendments, some of the lots in the Subdivision were resubdivided into lots smaller than 20,000 square feet.[2] The 1978 amendment of the lot size provision was in effect at the time Jupiter acquired its lot in 2017.

---

1. Zeus and Jupiter are entities controlled by Lane Halversen.

2. Indeed, several of the Neighbors, including Russell Walker and his wife, currently possess lots in the Subdivision smaller than 20,000 square feet.

¶4 Soon after acquiring its lot, Jupiter sought permission from local land use authorities to subdivide the lot into two smaller lots—the first measuring 8,075 square feet and the second measuring 13,655 square feet. Jupiter's effort—despite being facially compliant with the 1978 amendment to the CC&Rs—drew vocal opposition from many of the other lot owners in the Subdivision. One of those lot owners, Russell Walker, sent letters in May and June 2017 to Jupiter and Lane Halversen, purporting to "notify" them of the CC&Rs governing the use of Jupiter's property. The letters quoted the 1940 version of the CC&Rs, took the position that lots could not be resubdivided into parcels smaller than 20,000 square feet, and requested that Jupiter "comply with the restrictive covenants and not attempt to subdivide or build another structure" besides the existing single-family home on the lot.

¶5 In July 2017, some of the lot owners met to discuss their opposition to Jupiter's subdivision efforts, and several of them signed a paper expressing that opposition.[3] At the top of the paper appear the words "PLEASE DO NOT SUBDIVIDE [JUPITER'S LOT]." Below that statement appear several signatures, addresses, and phone numbers. The paper does not include any additional substantive text and, on its face, does not purport to amend the CC&Rs.

¶6 Neither Walker's letters nor the signed paper dissuaded Jupiter from its subdivision efforts, and some weeks later, in the fall of 2017, Jupiter obtained final approval from local land use

---

3. The paper is undated. In Neighbors' brief, they appear to assert that the paper was signed in May 2017. But in a sworn affidavit, Russell Walker appears to aver that the paper was signed in July 2017. We presume, for purposes of the narrative, that the paper was signed in July 2017, but whether it was signed in May or July is ultimately immaterial to our analysis.

authorities for its requested subdivision. Thereafter, Jupiter conveyed one of the two newly subdivided parcels to Titan Land Holdings LLC (Titan), another entity controlled by Halversen. For ease of reference, from this point forward we refer to Zeus, Jupiter, Titan, and Halversen collectively as "Owner."

¶7      A few months later, Neighbors—some of the owners of lots in the Subdivision, whose names are listed above, in the caption—filed suit against Owner, asserting claims for breach of restrictive covenants and for injunctive and declaratory relief. In connection with their complaint, Neighbors filed a notice of lis pendens against the newly subdivided lots. In their complaint, Neighbors cited the 1940 version of the CC&Rs, and alleged that Owner's resubdivision violated those CC&Rs because its new lots were each smaller than 20,000 square feet. Owner responded by filing a counterclaim, asserting claims for quiet title, slander of title, and intentional interference with business relations.

¶8      Owner also filed a motion asking the district court to either release the lis pendens or, in the alternative, at least require Neighbors to post a bond. The court agreed with the alternative approach and ordered Neighbors to post a $65,000 bond to maintain the lis pendens. Neighbors opted to release the lis pendens rather than post the bond.

¶9      Both sides soon filed opposing motions for summary judgment. In its motion, Owner sought summary dismissal of all of Neighbors' claims; in support of that motion, Owner cited the 1964 and 1978 amendments to the CC&Rs, and asserted that its resubdivision complied with the operative covenants. In their motion, Neighbors sought judgment in their favor on all their affirmative claims; in support of that motion, Neighbors continued to rely on the 1940 version of the CC&Rs, and asserted that Owner's resubdivision violated those covenants because the two new lots were smaller than 20,000 square feet. In addition, Neighbors

argued that the July 2017 paper signed by several lot owners constituted an agreement "to reaffirm" the lot size restriction contained in the 1940 CC&Rs. The district court scheduled oral argument on the cross-motions for July 9, 2019.

¶10   On July 8, 2019, the day before the scheduled oral argument, eleven of the fifteen owners of lots in the Subdivision met and signed a document captioned "Amendment Amending and Reaffirming Restrictive Covenants in [the Subdivision]." The document purported to amend the lot size restriction in the CC&Rs as follows: "No lot shall be resubdivided to contain less than 20,000 square feet except as otherwise platted before March, 1982." The signatures on the document were not notarized, and the record contains no evidence that the document was ever recorded. Neighbors lodged the document with the district court on the day it was signed.

¶11   After full briefing and oral argument, the district court granted Owner's motion and denied Neighbors' motion. The court determined that the 1964 and 1978 amendments were dispositive, and that Owner's resubdivision was in compliance with the operative language of the CC&Rs, as amended. The court rejected Neighbors' argument regarding the 2017 paper, stating that the document was

> simply a sheet of paper with a list of names (some signed, others printed) that states tersely at the top "PLEASE DO NOT SUBDIVIDE [OWNER'S LOT]." The document contains no formalities, the signatures are not notarized, and the document was never recorded. Even more fundamental, the document does not even purport to amend the existing covenants or place any restrictions on [Owner's] property. At most, the document is a polite request not to subdivide [Owner's lot]. In the

[c]ourt's view, the July 2017 "vote" is insufficient as a matter of law to override the 1964 and 1978 Amendments and to breathe new life into the original lot size restriction.

And because the July 2019 document purporting to amend the CC&Rs was lodged with the court on the day before oral argument, after briefing was complete, the district court "decline[d] to consider it." During oral argument, Owner agreed to voluntarily dismiss its counterclaims in the event that it prevailed on its summary judgment motion. On August 7, 2019, based on its summary judgment ruling and Owner's stipulation, the court entered final judgment in Owner's favor and against Neighbors on Neighbors' affirmative claims, and dismissed Owner's counterclaims without prejudice.

¶12    A few weeks later, Neighbors filed a motion to alter or set aside the judgment. In that motion, Neighbors asserted that their "notice to [Owner] of their opposition to the subdivision made [Owner] subject to" a 20,000-square-foot lot size restriction. In support of their contention, Neighbors cited *Mouty v. Sandy City Recorder*, 2005 UT 41, 122 P.3d 521. In a written ruling, the district court addressed and rejected Neighbors' argument on its merits, and on that basis denied the motion.

ISSUES AND STANDARDS OF REVIEW

¶13    Neighbors now appeal, and ask us to consider three issues. First, Neighbors argue that the district court erred in granting summary judgment to Owner on Neighbors' affirmative claims. "[W]e review a district court's grant of summary judgment for correctness, affording no deference to the court's legal conclusions." *Poulsen v. Farmers Ins. Exch.*, 2016 UT App 170, ¶ 8, 382 P.3d 1058. Second, and relatedly, Neighbors argue that the court erred in denying their motion to alter or set

aside the summary judgment order. "A [district] court's decision to grant or deny a motion for a new trial is reviewed for an abuse of discretion. However, if the court's ruling is based upon a conclusion of law, we review the decision for correctness." *Mardesich v. Sun Hill Homes LC*, 2017 UT App 33, ¶ 11, 392 P.3d 950 (quotation simplified). Lastly, Neighbors assert that the court erred in ordering the lis pendens released unless Neighbors posted a bond. We review the court's interpretation and application of the lis pendens statutes for correctness. *Meritage Cos. v. Gross*, 2017 UT App 223, ¶ 4, 409 P.3d 111.

ANALYSIS

¶14   In entering summary judgment in favor of Owner, the district court determined that Owner's resubdivision complied with the CC&Rs, as amended. Neighbors challenge that determination on appeal, and assert that Owner violated the CC&Rs when it resubdivided its lot into two lots that are both smaller than 20,000 square feet but larger than 8,000 square feet. No party to this case contests the fact that the CC&Rs— whichever version applies—run with the land and are binding on those who own lots within the Subdivision. *See Stern v. Metropolitan Water Dist. of Salt Lake & Sandy*, 2012 UT 16, ¶ 40, 274 P.3d 935 (noting that restrictive covenants are deemed to run with the land if four requirements are met, and that such covenants bind successive owners of the encumbered property). The dispute between the parties here turns on which version of the CC&Rs were in effect when Owner's lot was resubdivided, because the different versions of the CC&Rs vary regarding the allowable minimum lot size.

¶15   When the CC&Rs were initially recorded in 1940, they prohibited resubdividing lots to "less than 20,000 square feet." But as noted, the CC&Rs were amended in 1964 and 1978. The 1964 amendment lowered the minimum resubdivided lot size

from 20,000 square feet to 9,000 square feet. The 1978 amendment again lowered the minimum lot size, this time to 8,000 square feet. The parties do not dispute the validity of the 1964 and 1978 amendments.[4]

¶16    Owner acquired its lot in 2017, and completed the resubdivision process later that same year. At that time, the 1978 amendment had been in effect for nearly four decades, and because both of Owner's resubdivided lots were larger than 8,000 square feet, the version of the CC&Rs in effect in 2017[5] clearly permitted Owner's resubdivision.

---

4. As the district court noted, there is an argument to be made that both the 1964 and the 1978 amendments are invalid, for reasons discussed by our supreme court in *Swenson v. Erickson* (*Swenson I*), 2000 UT 16, 998 P.2d 807. In *Swenson I*, the court interpreted nearly identical CC&Rs as allowing amendments "only at such time as the covenants are due for extension," *id.* ¶¶ 33–34, and in a later appeal in that same case, the court clarified that, in *Swenson I*, it had expressed "the view" that "the property owners had twenty-four hours available to them every ten years to conduct the business associated with modifying or terminating" the CC&Rs, *Swenson v. Erickson* (*Swenson II*), 2007 UT 76, ¶ 11, 171 P.3d 423. But in this case, no party is asserting that the amendments to the CC&Rs are invalid for the reasons set forth in the *Swenson* cases, and because no party raises the argument, we do not address it. Therefore, like the parties, we presume for the purposes of our analysis that the 1964 and 1978 amendments were validly enacted.

5. We acknowledge that in 2019, on the day before the summary judgment hearing, eleven lot owners in the Subdivision signed a document purporting to amend the CC&Rs to restore the 20,000-square-foot subdivision restriction, at least for lots platted after

(continued…)

¶17 Neighbors resist this conclusion, however, and do so by advancing two arguments. First, they argue that the 2017 paper—created before Owner's subdivision was complete—represents a "vote" by a majority of the subdivision owners "to amend again or reaffirm the original [1940] Restrictive Covenants," including the 20,000-square-foot subdivision restriction. We find this argument unpersuasive. On its face, the paper does not purport to amend the CC&Rs in any way, and does not so much as mention the specific square-foot restrictions applicable to resubdivision of lots. We agree with the district court's assessment of the 2017 paper, in which the court stated that, "[a]t most, the document is a polite request not to subdivide [Owner's lot]." And we reject Neighbors' argument that the document constituted a "vote" or a "reaffirmation" of the pre-1964 subdivision lot size requirement.

¶18 Perhaps recognizing the 2017 paper's shortcomings, Neighbors cite Utah's "race-notice" recording statute, *see* Utah

---

(…continued)
March 1982. The district court refused to consider this document as part of its analysis due to the fact that it was submitted after summary judgment briefing was complete, and Neighbors do not challenge that decision on appeal. For this reason alone, we have no reason to—and do not—consider the document either. But even if we could consider this document, we have our doubts about whether it would have made a difference to the outcome of this case, given the fact that Owner had completed its resubdivision some two years earlier. *See East Sevier County Utility Dist. v. Wachovia Bank & Trust Co.*, 570 S.W.2d 850, 853 (Tenn. 1978) ("[N]o set of covenants should be given any general retroactive effect."); *see also State v. Clark*, 2011 UT 23, ¶ 13, 251 P.3d 829 ("[W]e apply the law as it exists at the time of the event regulated by the law in question.").

Code Ann. § 57-3-101 (LexisNexis Supp. 2020), and assert that the paper—along with the letters sent by Russell Walker—"gave notice" to Owner of substantial neighborhood opposition to Owner's subdivision plans. But Neighbors provide no support—in statute, case law, or otherwise—for the proposition that notice of mere neighborhood opposition can serve as a method of legally halting a landowner's actions. We agree with Owner's assertion, in its brief, that a landowner's knowledge that its neighbors oppose its actions, or that they "may even decide to amend the applicable covenants at some unknown time in the future," does not qualify as "'actual notice' of a *legally-cognizable* prior interest in real property."

¶19    Second, Neighbors direct our attention to *Mouty v. Sandy City Recorder*, 2005 UT 41, 122 P.3d 521, and contend that even if the governing CC&Rs allowed for resubdivided lots measuring 8,000 square feet or more, it was unreasonable for Owner to rely on them given Owner's awareness of Neighbors' stated opposition. We find this argument similarly unpersuasive.

¶20    In *Mouty*, a landowner asked the city to amend a zoning ordinance to permit a proposed development. *Id.* ¶ 4. The proposed amendment drew immediate community opposition but, despite that opposition, the city after public hearings amended the ordinance as requested by the landowner. *Id.* ¶ 5. About a week later, citizens who had opposed the amendment submitted an application for a referendum petition, hoping to obtain sufficient signatures to subject the newly amended ordinance to a popular referendum vote. *Id.* ¶ 6. Eventually, the city determined that insufficient signatures had been gathered, and refused to put the matter on the municipal ballot. *Id.* ¶¶ 7–8. The citizens sued, and the landowner defended the case, in part, by asserting that "zoning estoppel" barred the citizens' claim. *Id.* ¶ 13. Under that concept, "an applicant is entitled to a building permit or subdivision approval if [the] proposed development meets the zoning requirements in existence at the time of [the]

application and if [the applicant] proceeds with reasonable diligence, absent a compelling, countervailing public interest." *Id.* (quotation simplified). Our supreme court rejected the landowner's invocation of principles of zoning estoppel, on the facts of that case, in part because a state constitutional provision provides that "the residents of a municipality have the right to 'require any law or ordinance passed by the law making body of the county, city, or town to be submitted to the voters thereof, as provided by statute, *before the law or ordinance may take effect*.'" *Id.* ¶ 14 (quoting Utah Const. art. VI, § 1(2)(b)(ii)). As the court put it, "article VI prevents referable laws from taking effect until local voters have had the opportunity to exercise their right to seek a referendum." *Id.* For this reason, the court concluded that principles of zoning estoppel were inapplicable. *Id.* ¶ 15.

¶21 Neighbors claim *Mouty* stands for the proposition that "an applicant for development of property [is] not entitled to rely on zoning ordinances or Restrictive Covenants in effect at the time of the application if 'proceedings to amend (those) zoning ordinances are underway'" (quoting *Mouty*, 2005 UT 41, ¶ 13), and argue therefrom that, because Neighbors stated their opposition to Owner's resubdivision before it was approved, Owner is not entitled to rely on the 1978 amendment to the CC&Rs. We are unpersuaded, for two reasons.

¶22 First, and most substantively, the landowner in *Mouty* was not permitted to rely on a recently amended ordinance because, under the terms of the Utah Constitution, the ordinance was not deemed effective "until local voters have had the opportunity to exercise their right to seek a referendum." *See id.* ¶ 14. In this case, by contrast, the version of the CC&Rs upon which Owner relies had been in effect for nearly four decades. Because CC&Rs are treated as contracts, they are binding once it is clear the "parties reached agreement on complete and definite terms." *See Nunley v. Westates Casing Services, Inc.*, 1999 UT 100, ¶ 22, 989 P.2d 1077. In fact, one of the purposes behind

enforcement of CC&Rs as binding on all subdivision lot owners is "to give the owners of lots within such an area some degree of certainty as to future development." *See Smith v. Simas*, 2014 UT App 78, ¶ 14, 324 P.3d 667. As noted, Neighbors do not contend on appeal that the 1978 amendment was invalid. Thus, unlike *Mouty*, where the ordinance upon which reliance was sought had not yet taken full effect, in this case the contractual provision upon which Owner relies was unquestionably in effect, and Neighbors' stated opposition to Owner's subdivision plans was without legal significance.

¶23 Second, and relatedly, the outcome of the *Mouty* decision had nothing to do with the degree of public clamor or opposition to the amended ordinance, or even with the landowner's awareness of the public opposition; instead, it turned on the "compelling, countervailing public interest," rooted in our state constitution, in giving the public a chance to voice their disapproval of municipal legislation. *See* 2005 UT 41, ¶ 15. And this makes sense from a policy standpoint. If mere stated opposition to a neighbor's development were enough to legally stop the development, property owners could be held hostage to any of their neighbors' demands, and prevented from making changes to their property simply because opposing neighbors registered loud opposition. Moreover, such a rule would be difficult to administer, and would raise intractable questions about what level of stated public opposition—a neighborly visit, a demand letter, a lawsuit, a recorded document clouding title—would be sufficient to halt a project. Our system of property rights, including the details of what a landowner is permitted to do with its property, is dependent on the laws, ordinances, and contractual provisions in effect at the time the landowner's action takes place, and not at all dependent—at least not legally—on the level of neighborhood or public opposition.

¶24 In sum, the 1978 amendment—lowering the minimum resubdivided lot size to 8,000 square feet—was operative at the

time Owner resubdivided its lot. Accordingly, Owner's actions were entirely consistent with the applicable CC&Rs, and neither the 2017 paper nor *Mouty* changes that analysis.

¶25   And for similar reasons, the district court did not err by ordering the lis pendens released if Neighbors did not post a bond. A lis pendens is subject to release if "the court finds that the claimant has not established . . . the validity of the real property claim that is the subject of the notice." Utah Code Ann. § 78B-6-1304(2)(b) (LexisNexis 2018). Given that there exists no valid basis for Neighbors' objections to Owner's resubdivision under the governing CC&Rs, release of the lis pendens was warranted. *See id.*

## CONCLUSION

¶26   The district court did not err in granting summary judgment in favor of Owner on Neighbors' affirmative claims, denying Neighbors' post-judgment motion, or ordering the lis pendens released unless Neighbors posted a bond.

¶27   Affirmed.

————————